UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


SP PLUS CORPORATION                         CIVIL ACTION

v.                                          NO. 16-2474

IPT, LLC, d/b/a PAYLOCK                      SECTION "F"


<u>ORDER AND REASONS</u>

Before the Court are the plaintiff's and third-party defendant's motions for a judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). For the reasons that follow, the motions are GRANTED.

**Background**

This declaratory judgment action arises out of the contention by defendant IPT, LLC ("Paylock") that the use of "self-release" parking boot enforcement in the City of New Orleans ("City") infringes upon two of Paylock's federally-registered patents.

On May 16, 2014, the City awarded a prime contract to Professional Account Management, LLC ("PAM"), the third-party defendant in this action, to handle the city's parking ticket processing operations. Two months later, on July 17, 2014, PAM

1

entered a subcontract with SP Plus Corporation ("SP Plus"), the plaintiff in this action. The subcontract binds SP Plus to assist PAM in overseeing "vehicle immobilization/release functions," including the placement of immobilizing "boots" on vehicles parked illegally or belonging to a driver with outstanding fines or violations. To remove the boot immobilizing the vehicle, the driver must pay a fee as well as any outstanding fines.

Beginning in September 2014, SP Plus began attaching "self-release" boots[1] to infracting vehicles. By calling a telephone number left by SP Plus personnel, the driver of a booted vehicle could pay the costs over the telephone and receive a code that enabled the driver to immediately unlock and remove the boot before returning it to a designated drop-off spot. SP Plus offered this self-release option for more than 16 months.

Paylock is the holder of U.S. Patent No. 7,950,570, titled "Parking Environment Management System and Method," and U.S. Patent No. 7,988,046, titled "Vehicle Violation Enforcement System and Method" (the "570" and "046" patents). Both the '570 and '046 patents describe the steps involved in and technology requisite

---

[1] SP Plus acquired 108 patented "Titan Grip" boots from Universal Boot, Inc. The Titan Grip Boots are manufactured and patented by Team Manufacturing, Inc. Neither Universal nor Titan are parties to this litigation.

for a particularized process of enforcing parking violation penalties through self-release booting. Relying on "commercially available" components such as a Personal Digital Assistant (PDA), an immobilizing boot, an encoded lock, and a radio frequency identification (RFID) receiver, the patents claim a method of facilitating vehicle immobilization, penalty payment, and subsequent vehicle release without compelling the vehicle owner to wait for a municipal or booting company employee to arrive on scene and release the boot.

By following the processes outlined in the patents, an individual authorized to issue tickets and summonses can use the PDA to interact with a summons-issuing governing body database (SDB) to determine whether a vehicle is in violation[2] and subsequently attach an immobilizing boot with encoded lock and RFID receiver if appropriate. The individual responsible for the booted vehicle can then pay all outstanding fines by telephone before receiving the code -- identifiable by the centralized SDB via the boot's RFID receiver -- to unlock the immobilizing boot. According to Paylock, its patents remedied an inefficiency that had long maligned the parking violation enforcement industry.

---

[2] The '570 patent specifically calls for an RFID-based "PermitView" system enabling an issuing individual to scan a parked car to ascertain whether the vehicle is parked in a permissible area.

Neither patent specifies the kind of PDA, RFID receiver, or encoded lock that must be employed.

On February 4, 2016, Paylock informed PAM in a letter that the ongoing self-release booting operations in New Orleans infringed upon at least claim 9 of the '570 patent and claim 1 of the '046 patent. The letter threatened suit unless PAM immediately ceased any and all infringing activities and confirmed to Paylock within a month that its self-release booting days were over.

SP Plus claims to have learned about Paylock's letter on or around February 19, 2016. Out of an "abundance of caution," SP Plus discontinued its self-release booting operations a week later. SP Plus has since dispatched staff to manually unlock parking boots on an around-the-clock basis. On Paylock's March 4 response deadline, SP Plus identified itself as PAM's subcontractor to Paylock, and requested an additional 30 days to investigate and respond to Paylock's allegations. PAM asked for the same extension, which Paylock subsequently granted.

Instead of responding to Paylock, SP Plus filed a declaratory judgment action with this Court on March 25, 2016. SP Plus alleges that both the '570 and '046 patents are facially invalid under the requirements for patentable subject-matter in 35 U.S.C. § 101 or,

in the alternative, that its conduct infringes upon none of the patents' claims.[3]

On August 25, 2016, Paylock filed an infringement suit against PAM -- and PAM alone -- in the United States District Court for the District of New Jersey. There, Paylock alleges that PAM, with either full awareness of or willful blindness to the existence of Paylock's patents, knowingly and intentionally infringed the '570 or '046 patents. Paylock additionally accuses PAM of inducing the City into infringement, selling and offering for sale the self-release booting operations, and "contracting with others and instructing others in connection with the infringement." Finally, paragraph 11 of the complaint includes the allegation that PAM "has contacted multiple municipalities in the United States with the intent of engaging in booting operations," without specifying whether PAM offered to engage in *self-release* booting operations for those other municipalities.

Because Paylock's infringement suit arose largely out the same nucleus of facts as SP Plus's first-filed declaratory action, this Court exercised its discretion to enjoin the prosecution of the New Jersey infringement action while this declaratory action

_____

[3] SP Plus also asserted state law claims against Paylock, which this Court subsequently dismissed. <u>See</u> Order and Reasons 12/12/16.

proceeds.  <u>See</u> Order and Reasons 12/12/16 (granting SP Plus's
motion for preliminary injunction and denying Paylock's motion to
dismiss, stay, or transfer federal patent law claims, but granting
Paylock's motion to dismiss SP Plus's state law claims).[4]
Thereafter, Paylock answered SP Plus's complaint and filed a third-
party complaint against PAM in this Court.

SP Plus and PAM[5] now ask this Court to enter judgment on the
pleadings, pursuant to Rule of Federal Rule of Civil Procedure
12(c), and declare that the '570 and '046 patents are directed to
ineligible subject matter under 35 U.S.C. § 101.  SP Plus asserts
that the patents merely spell out a conventional, non-inventive
process for implementing the abstract idea of "self-service" in
the parking enforcement industry.

I.

---

[4] Meanwhile, Paylock appealed to the U.S. Court of Appeals for the
Federal Circuit this Court's December 12, 2016 ruling.  That appeal
remains pending.  Although this Court denied Paylock's request to
stay these proceedings pending the outcome of its appeal, the Court
granted its request to modify the injunction to permit it leave to
request a stay from the District of New Jersey.  <u>See</u> Order and
Reasons 3/23/17.  By "Letter Order," Paylock's informal motion to
stay proceedings in the District of New Jersey was granted.  <u>See</u>
Letter Order in Civil Action Number 16-5200 (D. N.J.)(Bongiovanni,
M.J.).
[5] PAM has adopted SP Plus's memorandum in support of the motion in
its entirety.

Federal Rule of Civil Procedure 12(c) permits any party to move for a judgment on the pleadings, provided the motion is made early enough to avoid delaying trial.  A court may grant a Rule 12(c) motion only if the pleadings evince no disputes of genuine material fact and questions of law alone remain.  <u>Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.</u>, 313 F.3d 305, 312 (5th Cir. 2002)(citations omitted).  Courts should thus adhere to the same standard in reviewing a 12(c) motion as they do in reviewing motions to dismiss under Rule 12(b)(6), accepting all well-pleaded facts as true and drawing all factual inferences in favor of the non-movant. <u>See</u> <u>id.</u> at 313 n.8; <u>Thompson v. City of Waco, Texas</u>, 764 F.3d 500, 502 (5th Cir. 2014) (citing <u>Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys</u>, 675 F.3d 849, 854 (5th Cir. 2012)(en banc)); <u>Doe v. Myspace, Inc.</u>, 528 F.3d 413, 418 (5th Cir. 2008); 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1368 (3d ed. 2004).

"'[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" <u>Gonzalez v. Kay</u>, 577 F.3d 600, 603 (5th Cir. 2009)(quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009))(internal quotation marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint

are true (even if doubtful in fact)." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)(citations and footnote omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." <u>Id.</u> at 679 (internal quotations omitted) (citing Twombly, 550 U.S. at 557).

Finally, just like when it reviews a motion to dismiss under Rule 12(b)(6), when reviewing a Rule 12(c) motion, "a district court 'must consider the [pleadings in their] entirety, as well as other sources ordinarily examined when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." <u>Funk v. Stryker Corp.</u>, 631 F.3d 777, 783 (5th Cir. 2011)(quoting <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007)).

Here, in addition to the pleadings, the Court may consider the language of the '570 and '046 patents in reaching its decision. See Anderson v. Kimberly-Clark Corp., 570 Fed. App'x 927, 932 (Fed. Cir. 2014)("[A] court may rely on documents outside the pleadings if they are integral to the plaintiff's claims and their authenticity is not disputed."). In reviewing this motion, then, the Court will accept the well-pleaded factual allegations of Paylock, the non-movant, as true, and draw all reasonable inferences from the language of the claims of the '570 and '046 patents in Paylock's favor. This deference to the non-movant, however, does not entail accepting as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." Iqbal, 556 U.S. at 678.

II.

*A.*


35 U.S.C. § 101 defines patentable subject matter:

> Whoever invents or discovers any new and useful process, machine, manufacture or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

35 U.S.C. § 101 (2012). This provision, the Supreme Court has held, implicitly excepts "laws of nature, physical phenomena, and

abstract ideas" from these general parameters of eligibility. Ass'n for Molecular Pathology v. Myriad Genetics, Inc., 133 S.Ct. 2107, 2116 (2013)(citation omitted); Diamond v. Chakrabarty, 447 U.S. 303, 309 (1980)(internal citations omitted).

In a seminal 2014 decision, the Supreme Court clarified the standard courts should employ when assessing whether a patent is directed to a subject matter-eligible invention or an abstract idea. Alice Corp. Party Ltd. v. CLS Bank Int'l, 134 S. Ct. 2347 (2014). The claims of the patents challenged in Alice described a process by which two parties to a financial transaction could mitigate "settlement risk" -- the risk that only one party will fulfill its payment obligations -- using a computerized system as a third-party intermediary. See id. at 2352-53. Although the patents described how the intermediary computer updates "shadow records" mirroring real-life accounts to assure each party that the other has sufficient funds to pay what is owed, they did not specify any computer or program requisite to complete the steps of the patents. See id.

The Court applied the two-part patent subject-matter eligibility inquiry it had earlier fashioned in Mayo Collaborative Servs. v. Prometheus Labs, Inc., 566 U.S. 66 (2012). The test first explores whether the challenged claims are directed to a

patent-ineligible concept such as a law of nature, physical phenomenon, or abstract idea. <u>Alice</u>, 134 S. Ct. at 2352-53. If and only if the patents at issue are directed to a patent-ineligible concept, a court moves to the second part of the analysis: determining whether the elements of the claims, both "individually and as an ordered combination," supply a concept sufficiently inventive "to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." <u>Id.</u> (quoting <u>Mayo</u>, 566 U.S. at 72-73); <u>RecogniCorp, LLC v. Nintendo, Ltd.</u>, --- F.3d ---, 2017 WL 1521590, at *2 (Fed. Cir. Apr. 28, 2017)("In other words, step two asks whether the patent claims 'an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application.'").[6]

Applying this test, the <u>Alice</u> Court determined that the claims were directed to a patent-ineligible concept and that the method claims failed to transform the abstract idea into a patent-eligible invention. <u>Alice</u>, 134 S. Ct. at 2355-2357. The Court acknowledged that all inventions "reflect, rest upon, or apply" patent-

---

[6] The Federal Circuit affirmed the district court's grant of judgment on the pleadings in favor of Nintendo because "[t]he patent's claims are directed to the abstract idea of encoding and decoding image data[, an abstract concept long utilized to transmit information], and the claims do not contain an inventive concept sufficient to render the patent eligible."

ineligible concepts. Id. at 2354. However, the Court found that, at their heart, these patents were predicated on the non-patentable, abstract idea of using a third-party intermediary to assuage the fears of parties to a financial transaction that the other party will not make good on its promises. See id. at 2356. The patents merely embodied the basic, established economic concept of intermediated settlement. Id.; see also Bilski v. Kappos, 561 U.S. 593, 611 (2010)(characterizing a method for financial risk-hedging as a process implementing a "fundamental economic practice long prevalent in our system of commerce").

Although the patent holders insisted that the central role of a computer in their "settlement risk" process supplied a sufficiently inventive concept, the Court disagreed. Id. at 2357. What mattered, the Court explained, was not the mere presence of a tangible system or machine such as a computer in a patent process, but, whether the patents' claims described how to use that technology to apply an abstract idea in a novel, inventive way. See id. at 2358. "Stating an abstract idea while adding the words 'apply it,'" the Court held, "is not enough for patent eligibility." Id. (quoting Mayo, 566 U.S. at 72). Because the patents called only for the use of a computer and programming code to implement their settlement risk management method, the Court found that the patents were directed to patent-ineligible subject

12

matter.  Id. The Court did caution, however, against construing the exclusionary principle underlying the patent eligibility inquiry so liberally as to "swallow all of patent law."  Id. at 2354.

In a torrent of post-Alice cases, the Federal Circuit further expounded upon what should inform a court's application of the two-part test for subject matter eligibility.  When assessing whether a patent is directed to an abstract idea, the Federal Circuit has instructed courts to focus on the claims' "character as a whole," focusing on the claims' purported "advance over the prior art."  Electric Power Group, LLC v. Alstom S.A., 830 F.3d 1350, 1353 (Fed. Cir. 2016); Affinity Labs of Texas, LLC v. DIRECTV, LLC, 838 F.3d 1253, 1257 (Fed. Cir. 2016). Consequently, the determination that a patent or group of patents is directed to an abstract idea can rest on the interpretation of a selection of representative claims, provided the remaining claims in the challenged patent are "substantially similar and linked to the same abstract idea."  See Content Extraction and Transmission LLC v. Wells Fargo Bank, National Ass'n, 776 F.3d 1343, 1348 (Fed. Cir. 2014)(citing Bilski, 561 U.S. at 612); Becton, Dickinson & Co. v. Baxter Int'l, Inc., 127 F. Supp. 3d 687, 689 n.3 (W.D. Tex. 2015).

Guiding principles have emerged. "[M]ethods of organizing human activity" are unsuitable patent subject matter. <u>In re TLI Commc'ns, LLC Patent Litigation</u>, 823 F.3d 607, 613 (Fed. Cir. 2016). Claims "directed to the mere formation and manipulation of economic relations," for instance, are directed to an abstract idea. <u>Content Extraction</u>, 776 F.3d at 1347; <u>see also</u> <u>Ultramercial v. Hulu, LLC</u>, 772 F.3d 709, 714-15 (Fed. Cir. 2014)(describing the use of advertisements as "exchange or currency" as an abstract idea). In addition, reliance on a tangible component or device as a vehicle for the implementation of an abstract idea does not render a patent claim subject-matter eligible. <u>See</u> <u>TLI</u>, 823 F.3d at 612. A patent does, by contrast, cover eligible subject matter if directed to a specific improvement in the functionality of an existing technological device or system. <u>See</u> <u>Enfish, LLC v. Microsoft Corp.</u>, 822 F.3d 1327, 1335-36, 1338 (Fed. Cir. 2016).

If a court reaches step two of the analysis, it should scrutinize not *what* a patent claim's subject matter is but *how* the patent's claims achieve their professed goal. <u>Electric Power</u>, 830 F.3d at 1355. The inquiry should identify the pivotal distinction "between patenting a particular concrete solution to a problem and attempting to patent the abstract idea of a solution to a problem." <u>Id.</u> at 1356. A patent's claims do not supply an inventive concept if they merely recite the implementation of an abstract idea with

14

"routine, conventional activity." <u>Ultramercial</u>, 772 F.3d at 715. Recitation of generic functions of existing technology are similarly non-inventive. <u>See</u> <u>Affinity Labs</u>, 838 F.3d at 1263 (Fed. Cir. 2016); <u>TLI</u>, 823 F.3d at 613-14; <u>Content Extraction</u>, 776 F.3d at 1348. Nevertheless, the "non-conventional and non-generic" arrangement of otherwise conventional or generic components *can* confer an inventive concept on a patent. <u>Bascom Global Internet Services, Inc. v. AT&T Mobility LLC</u>, 827 F.3d 1341, 1350 (Fed. Cir. 2016).

The limitation of an abstract idea to a "particular technological environment" does not by itself salvage a patent claim's eligibility. <u>Ultramercial</u>, 772 F.3d at 716 (quoting <u>Alice</u>, 134 S. Ct. at 2358); <u>but</u> <u>cf.</u> <u>DDR Holdings, LLC v. Hotels.com, L.P.</u>, 773 F.3d 1245, 1258-59 (Fed. Cir. 2014) (holding that patent claims recited patent-eligible subject matter by "specify[ing] how interactions with the Internet are manipulated to yield a desired result" rather than describing methods and functions commonplace to the Internet). Further, that some of the steps in a claim previously had not been employed in the art related to the patent does not suffice to supply an inventive concept. <u>Affinity Labs</u>, 838 F.3d at 1262.

*B.*

15

Before applying these standards to the Paylock patent claims, the Court must resolve a dispute between the parties over whether this Court owes a presumption of validity to the patents. Paylock urges the Court require SP Plus and PAM to establish the invalidity of the '570 and '046 patents by clear and convincing evidence.

The Supreme Court has not spoken as to whether a presumption of validity should inform the § 101 subject matter inquiry. However, in a well-reasoned concurrence, Judge Mayer of the Federal Circuit wrote that no presumption of subject matter eligibility applies in the § 101 calculus, reasoning that the Supreme Court has taken up several § 101 cases in recent years without mentioning any presumption of eligibility. See Ultramercial, 772 F.3d at 720-21 (Mayer, J., concurring)(noting that the rationale for the presumption of validity -- that the U.S. Patent and Trademark Office "in its expertise, has approved the claim" -- is especially diminished for those patents approved before the flurry of recent Supreme Court cases clarifying the eligibility standard, underscoring that "the PTO has for many years applied an insufficiently rigorous subject matter eligibility standard"). Because the Alice decision -- which the Paylock patents preceded by almost three years -- has served as a touchstone in this realm of patent law, it seems incongruous to presume the patents' validity rather than evaluating them under the new, ostensibly

more rigorous, standard espoused by the Supreme Court. Moreover, even if the presumption applied, as SP Plus points out, the clear and convincing standard would govern only disputes of fact, not the purely legal questions at issue here. See Nextpoint, Inc. v. Hewlett-Packard Co., No. 15 C 8550, 2016 WL 3181705, at *6 (N.D. Ill. June 8, 2016), aff'd, No. 2016-2312, 2017 WL 977036 (Fed. Cir. March 14, 2017)(quoting Kaavo Inc. v. Cognizant Tech. Solutions Corp., No. 14-cv-1192-LPS-CJB, 2016 WL 476730, at *3 (D. Del. Feb. 5, 2016)); Listingbook, LLC v. Market Leader, Inc., 144 F. Supp. 3d 777, 785 (M.D.N.C. 2015). Accordingly, the Court affords the '570 and '046 patents no presumption of validity.

III.

*A.*

The parties agree that the '570 and '046 methods generally describe a method of parking violation enforcement via a self-release booting system which enables the person responsible for a vehicle to remove an immobilizing boot without waiting for an enforcement company or municipal employee to arrive on the scene. SP Plus proposes that the independent[7] claims of each patent comprise the "representative claims" for the purpose of the Court's

---

[7] The claims in the patents which stand on their own, without reference to other claims.

subject matter eligibility analysis because the independent claims

embody the patents' "character as a whole."

The independent claims of the '046 patent include:

> 1. A method for enforcing parking violations comprising the steps of: communicating a violation and a location and ID of a vehicle locking boot attached to a vehicle to a host system controlled by an entity representing a summons issuing controlling governing body, communicating the identification of the host system to a person responsible for the vehicle, receiving payment of an associated fine, communicating a boot release code to the person responsible for the vehicle upon payment of the associated fine and receiving from the person responsible for the vehicle a deposit prior to the boot release code being communicated, receiving the boot from the responsible person and returning the deposit to the person responsible for the vehicle after receiving the boot.
>
> …
>
> 7. A method of enforcing parking violations comprising the steps of:
> a. communicating a location and identification information of a vehicle to a host system operated by a controlling entity;
> b. receiving instructions from the host system;
> c. attaching a locking boot to the vehicle;
> d. communicating a fine and contact information of the controlling entity to a person responsible for the vehicle;
> e. receiving a payment of the fine from the person responsible for the vehicle; and
> f. communicating a boot release code to the person responsible for the vehicle after receipt of the payment, wherein the payment includes a refundable boot deposit charge.
> …

12. A method of enforcing parking violations comprising the steps of:

a. communicating a location and identification information of a vehicle to a host system operated by a controlling entity:

b. receiving instructions from the host system;

c. attaching a locking boot having a unique code assigned thereto to the vehicle;

d. communicating unlocking instructions and the unique code to a person responsible for the vehicle, the unlocking locking instructions including a fine;

e. receiving the unique code and a payment of the fine from the person responsible for the vehicle; and

f. communicating a combination code for the locking boot to the person responsible for the vehicle after receipt of a payment of the fine, wherein the payment includes a refundable boot deposit charge.

…

15. A method for enforcing violations comprising the steps of: maintaining a database containing serial numbers of vehicle locking boots and corresponding boot release codes, the boot release codes being periodically changed and updated in the database so as to prevent improper distribution of the boot release codes, communicating a violation and a location and ID of the vehicle locking boot attached to a vehicle to a host system controlled by an entity representing a summons issuing controlling governing body, communicating the identification of the host system to a person responsible for the vehicle, receiving payment of an associated fine, communicating a boot release code to the person responsible for the vehicle upon payment of the associated fine.

The independent claims of the '570 patent consist of:

1. A parking management system comprising: a detection module for detecting scofflaw

violations, the detection module receiving data from a remote computer system and capturing a unique identifier associated with a parked vehicle, the detection module analyzing the data and the unique identifier in order to determine if a scofflaw violation is occurring and for issuing at least one enforcement action based upon the scofflaw violation; an enforcement module for executing the at [sic] least one enforcement action, the at least one enforcement action including immobilization of the parked vehicle via placement of a locking boot utilizing a boot release code on a tire of vehicle; and a resolution module for facilitating performance of remedial measures, the resolution module including a payment module for receiving payment of a fine with the at least one enforcement action by an operator of the vehicle, a release module for communicating the boot release code to the operator for releasing the parked vehicle from immobilization upon payment of the fine and a return module for communicating instructions to the operator for return of the locking boot. [W]herein the fine associated with the at least one enforcement action further comprises a deposit amount, returnable to the operator, upon successful removal and return by the operator, of the locking boot, to the parking management system.

…

9. A method of managing a parking program, the method comprising the steps of: receiving data from a remote computer system and electronically reading a unique identifier associated with a parked vehicle; analyzing the data and the unique identifier in order to determine if a scofflaw violation is occurring; issuing at least one enforcement action based on the scofflaw violation; executing the at least one enforcement action, the at least one enforcement action including immobilization of the parked vehicle via placement of a locking boot utilizing a boot

release code on a tire of a vehicle; and
facilitating performance of remedial
measures, the at least one remedial measure
including paying a fine associated with the at
least one enforcement action by an operator of
the vehicle, communicating the boot release
code to the operator for releasing the parked
vehicle from immobilization upon payment of
the fine and a return module for communicating
instructions to the operator for the return of
the locking boot, wherein the fine associated
with the at least one enforcement action
further comprises a deposit amount, returnable
to the operator, upon successful removal and
return by the operator, of the locking boot,
to the parking management system.
…
14. A parking management system comprising: a
detection module for detecting scofflaw
violations, the detection module receiving
data from a remote computer system and
capturing a unique identifier associated with
a parked vehicle, the detection module
analyzing the data and the unique identifier
in order to determine if a scofflaw violation
is occurring and for issuing at least one
enforcement action based upon the scofflaw
violation; an enforcement module for executing
the at least one enforcement action, the at
least one enforcement action including
immobilization of the parked vehicle and via
placement of a locking boot utilizing a boot
release code on a tire of a vehicle and
communicating an identification number of the
locking boot to a database; a resolution
module for facilitating performance of
remedial measures, the resolution module
including a payment module for receiving
payment of a fine associated with the at least
one enforcement action by an operator of the
vehicle, a release module for communicating
the boot release code to the operator for
releasing the parked vehicle from
immobilization upon payment of the fine and a
return module for communicating instructions

to the operator for return of the locking boot
and verifying the identification number of the
locking boot being returned matches the
identification number communicated to the
database.

In a footnote in its opposition papers, Paylock suggests, in
meek and conclusory fashion, that SP Plus has failed to show that
the aforementioned claims are "representative" of all the patents'
claims. The Court disagrees. Not only are the claims cited by SP
Plus representative of the sole claims which stand on their own,
but each describes the components and methods requisite to achieve
the patents' overarching goal: the implementation of a
communication system enabling self-release booting. Every other
dependent claim in the patents refers to and describes how to
execute the steps in the representative claims. Paylock has
advanced no persuasive argument justifying the need to separately
analyze these dependent claims. See Soverain Software LLC v.
Newegg Inc., 728 F.3d 1332, 1335 (Fed. Cir. 2013)(citations
omitted)(holding that dependent claims "rise and fall together"
with independent claims if not separately argued before the court).
Accordingly, the Court finds that the non-representative dependent
claims are "substantially similar and linked to the same. . . idea"
as the proposed representative claims. See Content Extraction,
776 F.3d at 1348. The Court can and will conduct its analysis on
the basis of these representative claims.

*B.*

Step one of the <u>Mayo</u>/<u>Alice</u> patent eligibility test inquires as to whether a patent's claims are directed to a patent-ineligible concept, such as an abstract idea. The Court finds that the '570 and '046 patents are directed to the abstract idea of expediting the vehicle immobilization process via self-service.

Paylock insists that its patents are "firmly rooted" in the self-release boot apparatus and exhorts the Court to focus on the "specific, novel and technical limitations" laid bare by the patents' language. Paylock rightly admonishes the Court to avoid oversimplifying or distorting the character of the patents' claims.

But a reading of the patents' plain language only betrays Paylock's arguments. It is telling, for instance, that for all Paylock's touting of the patents' reliance on the "novel apparatus" of the self-releasing boot, the patent claims themselves never divulge the technical specifications of the "self-releasing boot" Paylock insists is required to perform the patents' steps. Instead, the patent claims describe the actual boot with no greater degree of specificity than as "a locking boot having a unique code." In other words, rather than offering a specific, novel, or technical improvement on the "self-releasing boot" apparatus, the claims

23

essentially instruct us to "Use a self-releasing boot."[8]  See TLI,
823 F.3d at 612 (holding that the characterization of a telephone
unit as a mere "conduit" for classifying and storing images,
without a more technical specification, did not confer patent-
eligibility under step one of the Alice test).  Similarly, while
the '570 and '046 patent claims feature other, specific limitations
and requirements, such as the use of RFID receivers and the need
for a "remote computer system" or PDA to identify vehicles and
communicate their scofflaw status to a centralized host system,
none are directed to a technological improvement in how each
component works, or in how the use of each component promotes a
technological advance.  See Enfish, 822 F.3d at 1335-36, 1338.  By
contrast, the patents underscore their described methods'
compatibility with existing, commercially available technology.
They describe the relevant components and methods "in purely
functional terms."  See TLI, 823 F.3d at 612.

What Paylock has really patented -- its patents' "character
as a whole" -- is a system which uses existing technology to
alleviate the annoyance of those who, likely already vexed by the
boot immobilizing their vehicle, must be more inconvenienced in

_____

[8] Consider the absurdity of a hypothetical inventor who claims to
have invented a patentable "method" for self-locking briefcases
but limits the description of the actual briefcase to "a briefcase
that locks itself."

depending on and waiting for a service attendant to arrive on the scene or else arrange for alternate transportation. Assuming, as the Court must at this stage, that Paylock's patents were the first to describe such a system, the claims do describe an improvement over the prior art. They ease the rigmarole of vehicle immobilization by cutting out the physical middle-man and permitting a person responsible for an immobilized vehicle to contact the booting entity and expediently and autonomously release the boot. Nonetheless, this improvement embodies an abstract idea: the basic economic concept of mitigating financial, time-consuming, and even emotional cost by facilitating self-service. Just as self-service gas pumps allow drivers to quickly fill up without burdening attendants, and self-service grocery checkout stations allow shoppers to quickly pay without burdening cashiers, the system described by these patents allows vehicle owners to quickly unshackle their cars without personally interacting with or waiting for a municipality or enforcement employee to be sent out to the vehicle. It follows the trend of facilitating customer service with the least amount of person to person interaction, tailored to the parking enforcement industry.

The streamlining of a tedious process may be a welcome improvement, but it is, at its heart, an abstract one: a way of more efficiently "organizing human activity." See TLI, 823 F.3d

at 613. A survey of post-_Alice_ precedent reinforces this conclusion. See, _e.g._, _FairWarning IP, LLC v. Iatric Sys., Inc._, 839 F.3d 1089, 1093-95 (holding that patent claims "purport[ing] to accelerate the process of analyzing audit log data" with general purpose computing technology did not describe patent eligible subject matter); _Electric Power_, 830 F.3d at 1353 (holding that claims directed to collecting and analyzing information directed to an abstract idea); _TLI_, 823 F.3d at 611-12 (invalidating under § 101 a patent providing a method for classifying and storing images with existing telephonic technology); _Enfish_, 822 F.3d at 1337-38 (reversing the district court's finding of subject matter ineligibility specifically because the patent claims' self-referential database table improved computer functionality); _Content Extraction_, 776 F.3d at 1347 (holding that a patent directed toward collecting, recognizing, and storing data using existing technology was directed toward an unpatentable economic idea); _Nextpoint_, 2016 WL 3181705, at *4-5 (observing that patent claims directed to using cloud technology to manage litigation information presented no "specific technical solution"). Therefore, the Court finds that the '570 and '046 patents are directed to patent-ineligible subject matter.[9]

_____

[9] Given the bevy of Federal Circuit and district court cases following _Alice_ which have addressed similar issues under the §

*C.*

Under step two of the <u>Alice</u> test, the Court searches for an inventive concept. The '570 and '046 patents may nonetheless survive if, both individually and as an ordered combination, their claims supply an "inventive concept" to the abstract idea of expediting the booting process via self-service. The Court finds that they do not.

To be sure, the representative claims of the '570 and '046 patents provide for an elaborate, multifaceted process of facilitating self-release booting. They require RFID, telephonic, and computing technology to interface in a specific way that allows: (1) parking enforcement employees to ascertain whether a vehicle is in violation; (2) those same employees to, if necessary, attach an identifiable immobilizing boot with a unique release code to the vehicle; and (3) the person responsible for the immobilized vehicle to call a centralized host system, pay a deposit, and receive the correct code for the boot.

Ultimately, however, the sundry methods and components described in the Paylock patents never transcend the generic. The mere inclusion of several technological devices and recitation of

_____

101 subject matter standard, the Court rejects Paylock's argument that SP Plus is conflating a nonobviousness inquiry under § 103 with the proper § 101 analysis.

their generic functions does not "transform" the abstract idea at the heart of these patent claims. There is nothing inherently "inventive" about using an RFID device to communicate via radio signal to a host system, or a centralized computer to store data, or an immobilizing boot to immobilize a car, or a telephone to place a call. Each claim, analyzed individually and in combination, calls for the implementation of *conventional*, general means of achieving the patents' end: hastening the slog of the parking enforcement process by enabling swift vehicle identification and obviating the need for third-party boot removal. See Ultramercial, 772 F.3d at 715.

In adhering to its duty to assess the "how" of the '570 and '046 patents at this stage, the Court simply cannot discern any manner in which the representative claims add the non-generic, transformative spark needed to pry them out of the doldrums of subject matter ineligibility. See Electric Power, Electric Power, 830 F.3d at 1355. The claims describe a detailed but predictable and generic process of implementing a non-patentable abstract idea.[10] Neither the limitation of the claims to the "particular

_____

[10] Paylock submits that its patents solved the problems and business challenges attendant with prior inefficient booting operations by "require[ing] self-release booting technology" in every claim of their patents. But coupling generic communication techniques and generic technological components with self-release booting technology to effectuate the abstract idea of "self-release"

technological environment" of parking enforcement, nor the novelty of these claims to the industry, can alter that reality. See Affinity Labs, 838 F.3d at 1262; Ultramercial, 772 F.3d at 716 (quoting Alice, 134 S. Ct. at 2358).

As was the case with step one of the Alice test, a comparative analysis of the jurisprudence supports the Court's step two conclusion. See, e.g., Affinity Labs, 838 F.3d at 1262-63 (refuting that sequence of steps describing how to use cellular devices to display out-of-region regional broadcasts provided an inventive concept, notwithstanding claims that the processes were "novel" to the industry); Electric Power, 830 F.3d at 1355 ("Nothing in the claims, understood in light of the specification, requires anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information."); Bascom, 827 F.3d at 1349-51 (finding an inventing concept where the claims harnessed installation of a filtering tool with customizable filtering features to describe a highly-specific method of filtering Internet content); Content Extraction, 776 F.3d at 1348 (holding that the use of existing scanning technology did not embrace an inventive concept to patent claims directed at collecting,

---

booting in the parking enforcement industry does not transform its abstract idea into a patent-eligible invention.

recognizing and storing data); <u>Ultramercial</u>, 772 F.3d at 715-16 (denying that the recitation of "routine additional steps" in offering media content in exchange for the viewing of an advertisement transformed a patent's abstract idea in any meaningful way); <u>Apollo Finance, LLC v. Cisco Sys., Inc.</u>, 190 F. Supp. 3d 939, 947 (C.D. Cal. 2016)(finding that no inventive concept existed for patent claims on Internet learning where none of the claims' limitations "change[d] the *purpose* of the claims"). Accordingly, the '570 and '046 patent claims do not add an inventive concept sufficient to render the challenged claims something more than claims on the abstract idea itself.

### Conclusion

Based on the foregoing analysis, the Court finds that the '570 and '046 patents are directed to ineligible subject matter under 35 U.S.C. § 101. Accordingly, IT IS ORDERED: that the plaintiff's and third-party defendant's motions for judgment on the pleadings are hereby GRANTED and the Court hereby declares that Paylock's U.S. Patent No. 7,988,046 entitled "Vehicle Violation Enforcement System and Method" and U.S. Patent No. 7,950,570 entitled "Parking Environment Management System and Method are invalid under 35 U.S.C. § 101 because the patents are directed to patent-ineligible subject matter. Within seven days,

the plaintiff and third-party defendant shall submit a proposed judgment consistent with this Order and Reasons.

New Orleans, Louisiana, May 19, 2017

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE